# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 17-898T
(Filed: August 11, 2022)

| | |
|---|---|
| **HIGHMARK, INC.** *and subsidiaries,* )<br>)<br>*Plaintiff,*  )<br>)<br>**v.**  )<br>)<br>**UNITED STATES,**  )<br>)<br>*Defendant.* )<br>) | Tax Refund: Special Deduction under I.R.C. § 833(b); Liability; Cost-Plus Contract |

*Maria O'Toole Jones*, Miller & Chevalier Chartered, Washington, DC, for plaintiff. *Laura G. Ferguson* and *Lisandra Ortiz*, Miller & Chevalier Chartered, Washington, DC, Of Counsel.

*Karen E. Servidea*, Trial Attorney, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, Washington, DC, for defendant. With her on the briefs were *David A. Hubbert*, Deputy Assistant Attorney General, *David I. Pincus*, Chief, *Mary M. Abate*, Assistant Chief, and *Mark A. Ryan* and *Katherine Powers*, Trial Attorneys, Court of Federal Claims Section, Tax Division, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER

**BONILLA,** *Judge.*

    This tax refund case arises from a series of amended United States federal income tax returns filed by an independent licensee of the Blue Cross Blue Shield Association (BCBSA). Plaintiff, Highmark, Inc. and subsidiaries (Highmark), seeks an income tax refund in the aggregate amount of approximately $185 million for tax years 2004 through 2007. The principal basis for Highmark's overpayment claims rests upon the scope of the "special deduction" codified at 26 U.S.C. § 833(b), I.R.C. § 833(b) [hereinafter "§ 833(b)"]. Highmark also asserts entitlement to an increased interest deduction for tax year 2007, an offset to capital gains reported in tax year 2007 based upon an alleged capital loss incurred in tax year 2006, and

consequent corrective adjustments to the company's general business credit and allowable charitable contribution deductions.

Pending before the Court are the parties' cross-motions for partial summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), limited to Highmark's asserted legal interpretation of the scope of the § 833(b) special deduction.[1]  For the reasons set forth below, plaintiff's motion for partial summary judgment is DENIED and defendant's cross-motion for partial summary judgment is GRANTED.

## BACKGROUND

BCBSA is a national association of 35 independently owned and locally operated Blue Cross Blue Shield (BCBS) companies, which collectively provide health insurance coverage for 114.5 million members in all 50 states, the District of Columbia, and Puerto Rico.  BCBSA, which owns and manages the Blue Cross and Blue Shield trademarks and names worldwide, grants use licenses to the independent companies for the exclusive geographic areas in which they operate.  Each BCBS company (or licensee) engages local healthcare providers and medical facilities which, in exchange for a participating (or preferred) provider designation, negotiate discounts for medical treatment and services under Participating Provider Agreements.

BCBSA Licensing Agreements require BCBS companies—referred to as "Plans"—to comply with the BCBSA Membership Standards.  Relevant here, Membership Standard 5 requires each Plan to participate in specified national programs, including the BlueCard Program.  Formally introduced on March 1, 1995, the BlueCard Program enables BCBS members (a/k/a subscribers or policy holders) to transport their Blue Cross and Blue Shield health insurance coverage across state lines or otherwise outside a specific Plan's service area.  This national coverage is accomplished through each Plan's agreement with BCBSA to offer all BCBS members access to their respective in-network (local) providers at negotiated discounts regardless of the specific Plan associated with the member's enrollment; actual health insurance coverage, however, is governed by the Plan in which the member is enrolled.  When a Plan (Plan A) opens its preferred provider network to a BCBS member of another Plan (Plan B), Plan A is known as the "Host Plan" and Plan B is known as the "Home Plan."  Accordingly, under this

---

[1] Initially, Highmark also moved for partial summary judgment on its claimed increased interest deduction and offsetting capital loss.  During oral argument, Highmark withdrew its dispositive motion with regard to the first issue and confirmed its mid-briefing withdrawal of the second.  Highmark's claimed entitlements to increased general business tax credit and allowable charitable contribution deductions are dependent upon favorable resolution of the primary tax issues presented

collective national coverage scheme, each BCBS company serves as a Home Plan to its subscribers and a Host Plan to subscribers of other BCBS companies.

When a BCBS member receives medical treatment or services from a Host Plan provider, the participating provider submits an invoice to the Host Plan. The Host Plan then determines the discounted price of the services rendered as previously negotiated under the Participating Provider Agreement executed between the Host Plan and the participating provider. The Host Plan does not, however, adjudicate the claim under the member's Home Plan or otherwise make any determinations regarding member eligibility or Home Plan coverage. Instead, the Host Plan forwards a "Submission Format" record to the Home Plan through a centralized inter-Plan software platform detailing the services rendered along with the participating provider's initial invoice and discounted costs under the Host Plan's Participating Provider Agreement. The Home Plan then adjudicates the matter (referred to by Highmark as a "Host Claim") under the terms of the subscriber's Home Plan health benefits contract to determine, among other things, eligibility, coverage allowances, calendar year deductibles, coinsurance, Medicare or other insurance, copayments, and penalties.

Following its adjudication, the Home Plan returns a "Disposition Format" record to the Host Plan through the same inter-Plan portal detailing the Home Plan coverage and allowances, including any authorized payment to the participating provider and the Administrative Expense Allowance and Access Fee due the Host Plan.[2] Once the Home Plan coverage and allowances are approved and communicated, the Host Plan typically remits payment to their participating provider in the approved amount.[3] The Host Plan then prepares and transmits a "Reconciliation Format" record to effect reimbursement from the Home Plan in the aggregate amount approved in the Disposition Format record. As for any delta between the participating provider's (discounted) invoice and the payment ultimately authorized by the Home Plan, the participating provider can appeal any denial to the Home Plan or bill the BCBS member directly. The Host Plan does not engage in either process.

Reconciliation Format records are processed through the Central Financial Agency (CFA): an independent financial institution serving as a clearing house to verify, calculate, and distribute net settlements between Home Plans and

---

[2] The Administrative Expense Allowance and Access Fee are standard fee arrangements to compensate Host Plans for overhead and costs attributable to opening their network of providers to subscribers of other Plans and preparing and submitting the necessary reimbursement paperwork described herein. The standard fees are memorialized in the BCBSA Licensing Agreements.

[3] In limited circumstances not applicable here, arrangements are made for Home Plans to remit payment directly to Host Plan participating providers.

Host Plans on a daily basis.[4]  To illustrate by simple example: if Plan A owes Plan B $100, and Plan B owes Plan C $75, and Plan C owes Plan A $50, the CFA would withdraw $50 from Plan A's designated account and deposit $25 each in Plan B's and Plan C's designated accounts.  To effect the net transfers between and among Home and Host Plans, each BCBS company is required to designate an account at a financial institution of its choosing, authorize the CFA to make deposits and withdrawals, and maintain a minimum balance.  CFA deposits and withdrawals are generally accomplished through Automated Clearing House (ACH) electronic bank transfers.

Highmark is the fourth largest BCBS company, serving more than six million subscribers in Pennsylvania, Delaware, West Virginia, and New York.[5]  As with all BCBS companies, Highmark serves as the Home Plan for its subscribers and the Host Plan for subscribers of other BCBS companies seeking medical treatment and services from Highmark's network of participating providers.  In December 2011, Highmark filed amended federal income tax returns for tax years 2004 through 2007, claiming increased § 833(b) special deductions in the aggregate amount of approximately $520 million based on over $5 billion in payments Highmark purportedly made to its participating provider networks while serving as the Host Plan.  Neither figure deducts nor otherwise accounts for reimbursements received from Home Plans.  Moreover, this marked the first time Highmark ever sought to include reimbursed Host Claims in its § 833(b) calculus.

## DISCUSSION

### I.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Material facts," in turn, are those "that might affect the outcome of the suit."  *Id.*  In deciding motions for summary judgment, particularly where, as here, the parties filed cross-motions for summary judgment, the Court must draw all inferences in the light most favorable to the nonmoving party, evaluating each motion on its own merits.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

---

[4] Between at least 2004 and 2007, Mellon Bank, N.A., served as the CFA for the BCBSA.

[5] https://www.highmark.com/about/our-story.html#:~:text=Highmark%20is%20the%20largest%20health,service%20marks%20in%20West%20Virginia (last visited Aug. 8, 2022).

The moving party bears the initial burden to demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden can be met by showing "there is an absence of evidence to support the nonmoving party's case." *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing *Anderson*, 477 U.S. at 248). Summary judgment is warranted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## II. Special Deduction

The sole issue before the Court today is one of first impression: whether BCBS companies like Highmark may include reimbursed Host Plan payments to their network providers in calculating the § 833(b) special deduction on their annual federal income tax returns. The short answer is no.

As recently explained by the United States Court of Appeals for the Federal Circuit:

> Statutory interpretation starts with the plain language of the statute. When interpreting a statute, however, courts must consider not only the bare meaning of each word but also the placement and purpose of the language within the statutory scheme. The meaning of statutory language, plain or not, thus depends on context. Courts may also rely on legislative history to inform their interpretation of statutes.

*Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1342 (Fed. Cir. 2021) (cleaned up). Here, the plain language of § 833(b)—read in context and against the backdrop of the special deduction's legislative history—does not allow the inclusion of reimbursed Host Plan payments to network providers in the BCBS special deduction calculation.

Title 26, United States Code, Section 833—titled "Treatment of Blue Cross and Blue Shield organizations, etc."—provides in relevant part:

> (2) **Special deduction allowed**.—The deduction determined under subsection (b) for any taxable year shall be allowed.
>
>    . . .
>
>    (b) **Amount of deduction**.—

> (1) **In general**.—Except as provided in paragraph (2), the deduction determined under this subsection for any taxable year is the excess (if any) of—
>
>> (A) 25 percent of the sum of—
>>
>>> (i) the claims incurred during the taxable year and liabilities incurred during the taxable year under cost-plus contracts, and
>>>
>>> (ii) the expenses incurred during the taxable year in connection with the administration, adjustment, or settlement of claims or in connection with the administration of cost-plus contracts, over
>>
>> (B) the adjusted surplus as of the beginning of the taxable year.
>
> (2) **Limitation**.—The deduction determined under paragraph (1) for any taxable year shall not exceed taxable income for such taxable year (determined without regard to such deduction).

26 U.S.C. § 833(a)(2) & (b), I.R.C. § 833 (a)(2) & (b) (emphases in original). This section of the United States tax code was enacted following the passage of the Tax Reform Act of 1986 (Pub.L. No. 99–514, § 1012, 100 Stat. 2085, 2390–94 (codified at 26 U.S.C. §§ 501(m) & 833)), which revoked the tax-exempt status of BCBS companies. *See Cap. Blue Cross v. Comm'r of Internal Revenue*, 431 F.3d 117, 120–21 (3rd Cir. 2005).

   Highmark argues that reimbursed Host Plan payments to their network providers qualify as "liabilities incurred . . . under cost-plus contracts" for purposes of § 833(b)(1)(a)(i). The Court disagrees. These payments are neither a liability for Highmark nor incurred by Highmark under a cost-plus contract. As explained *supra*, network provider payments are not remitted by a Host Plan unless and until the subscriber's Home Plan independently adjudicates eligibility and coverage and pre-approves the amount, if any, payable to the participating provider under the subscriber's Home Plan; the Home Plan then near simultaneously reimburses the Host Plan the full amount of the approved payment along with predetermined administrative and access fees. For these reasons, the provider payments at issue are properly included as "claims incurred" in the *Home* Plan's § 833(b) calculation, but not concurrently included as "liabilities incurred . . . under cost-plus contracts" in the *Host* Plan's § 833(b) calculus.

## A.     *Liability*

A liability is defined as a legal obligation to pay, "enforceable by civil remedy or criminal punishment." *Black's Law Dictionary* 1097 (11th ed. 2019). When serving as a Host Plan under the BlueCard Program, Highmark incurs no such obligation. Instead, Highmark's role is limited to: opening its network of healthcare providers and facilities to all BCBS subscribers regardless of their specific Home Plan; passing along its network providers' invoices and pre-negotiated discounts to the Home Plan for medical services provided to the Home Plan's subscribers; and remitting payment to its network providers in the amounts authorized and near simultaneously reimbursed by the Home Plan in accordance with the terms of the subscriber's Home Plan policy. As the Host Plan, Highmark is not involved in disputes between the Home Plan and the subscriber, the Home Plan and the participating provider, or the participating provider and the subscriber. As such, Highmark's claimed "liability" is more accurately characterized as an asset (i.e., account receivable).[6]

"The true character of expenditures, which depends upon the special facts of each case, determines their income tax consequences." *Burnett v. Comm'r of Internal Revenue*, 356 F.2d 755, 758 (5th Cir. 1966) (cleaned up). Addressing the analogous business expense deduction under I.R.C. § 162(a), the United States Court of Appeals for the Fifth Circuit noted: "it is well settled that an expenditure for which there is an unconditional right of reimbursement is not deductible as a business expense since such expenditures are in the nature of loans or advancements." *Burnett*, 356 F.2d at 759 (cleaned up). The same must be said of Highmark's payments to its network providers as the Host Plan *on behalf of* the subscriber's Home Plan, particularly in light of the facts that the Home Plan independently approves the amount to be remitted and Highmark is virtually certain of immediate reimbursement.[7] Accordingly, Host Plan payments to their network providers on behalf of Home Plans—more aptly characterized as loans or advances pending imminent reconciliation by and reimbursement through the independent CFA—do not constitute "liabilities" in a Host Plan's special deduction calculation under § 833(b).

A contrary finding would create a statutory framework where multiple BCBS companies could include the same participating provider payment in their § 833(b) calculations, increasing exponentially dependent upon how many reimbursement

---

[6] In fact, as noted *supra*, in addition to a full reimbursement of the network provider payment, Highmark receives predetermined administrative and access fees.

[7] During oral argument, the parties could not cite an example where a Home Plan refused or failed to reimburse a Host Plan after pre-approving payment to the Host Plan's participating provider.

7

layers are incorporated into a particular reimbursement scheme.  Indeed, under Highmark's interpretation of the statute, the Home Plan and the Host Plan are entitled to include the same participating provider payment as a "claim incurred" and a "liability incurred," respectively, in their special deduction calculations.  Congress generally disfavors such double counting, let alone the resulting windfall sought by Highmark.  *See Sunoco, Inc. v. United States*, 908 F.3d 710, 719 (Fed. Cir. 2018) ("Congress does not generally allow taxpayers to receive a tax benefit twice.").  Home Plans bear the sole legal obligation to pay their subscribers' policy claims and, thus, are singularly entitled to include network provider payments in their special deduction calculations under § 833(b).

     B.    *Cost-Plus Contract*

Highmark's novel interpretation of § 833(b) also fails because no cost-plus contract exists between Home Plans and Host Plans.  Under the BlueCard Program, contracts exist between each Plan and the BCBSA (i.e., Licensing Agreements), Host Plans and their network of providers (i.e., Participating Provider Agreements), and Home Plans and their subscribers (i.e., Home Plan health benefits contracts).  Each Plan's agreement with the BCBSA to support all Plans under their BCBSA Licensing Agreement does not, in turn, create or otherwise establish 595 contracts among the different Plans.[8]  *See St. Luke's Episcopal Hosp. v. Louisiana Health Serv. & Indemnity Co.*, No. 08-1870, 2009 WL 47125, at *9 (S.D. Tex. Jan. 6, 2009) (BCBS companies are not in privity of contract with one another; rather, each BCBS company joined BCBSA to secure national healthcare services for their respective subscribers).  As explained *supra*, the interaction between Host Plans and Home Plans is limited to the exchange of Submission Format and Disposition Format records when a subscriber seeks medical care outside their Home Plan service area.[9]  Host Plans and Home Plans do not normally engage in negotiations and the exchange of reimbursement records is performed in accordance with each Plan's BCBSA License Agreement, not a Home-Host Plan contract.[10]

---

[8] The combination calculation employed to generate the 595 contracts includes the 35 BCBS companies in pair combination (without duplication): $35! / [2! (35 – 2)!] = 35! / (2! \times 33!) = 595$.

[9] The Reconciliation Format records are submitted to and independently processed by the CFA.

[10] During oral argument, the Court inquired *sua sponte* whether the exchange of Submission Format and Disposition Format records creates micro contracts between Home Plans and Host Plans regarding specific healthcare claims.  Highmark countered that the reimbursements evidence a macro BlueCard Program cost-plus contract between Home Plans and Host Plans.  For the reasons stated herein, the Court finds that the individual administrative reimbursements further support the conclusion that reimbursed Host Plan payments to network providers are advances or loans made in accordance with each Plan's obligations to BCBSA under its Licensing Agreement rather than an implied-in-fact cost-plus contract between Home Plans and Host Plans.

Further, a Host Plan's payments to its network providers on behalf of the Home Plan are not "incurred under" the BlueCard Program but, rather, the specific Participating Provider Agreement.[11] *See* ECF 91-1 at 109 ("The Host Licensee receives the claim from the provider and determines the price of the service rendered *based on its contract with the provider*." (emphasis added)). All subsequent adjustments to the participating provider's discounted invoice are independently determined by the Home Plan under the Home Plan's contract with its subscriber. *Id.* ("The Home Licensee then adjudicates the claim according to the member's health benefits contract and determines the claim's disposition."). The Host Plan's remittance of the independently adjudicated payment due the network provider on behalf of the Home Plan pending certain and imminent reimbursement is a ministerial function arising from the Host Plan's BCBSA Licensing Agreement. The BlueCard Program does not create an independent liability to the network provider beyond what is already required under Highmark's Participating Provider Agreements.

In contradistinction, self-funded group health plans managed by insurance companies have a direct contractual relationship between an employer assuming the financial risk for providing healthcare benefits to employees and the third-party administrator. More specifically, when an employer engages Highmark to serve as the third-party administrator for a self-funded group health plan, the parties execute the cost-plus contract contemplated in § 833(b). Under such contracts, Highmark offers its network of healthcare providers and facilities to the employee-subscribers and manages the employer-designed healthcare benefits. In its management role, moreover, Highmark engages in disputes between the employer and its employees regarding coverage as well as disputes between participating providers and employees of the self-funded plans. In exchange, Highmark receives payments for its administrative and program management services as well as reimbursement for payments made to its participating providers as determined under the employer-designed healthcare plan.[12]

C. *Legislative History*

Under the plain meaning of the statute, read in context, the Court concludes that reimbursed Host Plan payments to network providers are not properly

---

[11] Highmark readily concedes that Host Plan contracts with its network providers (i.e., Participating Provider Agreements) are not cost-plus contracts. ECF 91 at 27 n.13 ("Highmark does not maintain that its contracts with providers are 'cost-plus contracts.'").

[12] In sanctioning the applicability of the § 833(b) special deduction when BCBS companies serve as third-party administrators of self-funded group health plans, the Court is mindful that employers concurrently use participating provider payments in calculating their federal income tax deductions (e.g., business expenses, medical expenses). Distinct from Highmark's proposed interpretation of § 833(b)—which simultaneously classifies the same payment as both a "claim incurred" and a "liability incurred" by two BCBS companies under the same subsection of the tax code—however, the claimed tax deductions in this instance call upon separate provisions of the tax code employed for distinct purposes.

included in Highmark's § 833(b) special deduction calculation.  Instead, they are reserved for the Home Plan, which is legally obligated for the claims incurred.  A review of the legislative history of § 833(b) supports this statutory construction.

The § 833(b) special deduction was enacted to ensure BCBS companies, although no longer tax-exempt, could "maintain reserves equal to 25 percent of the year's health-related payouts" in recognition of "their continuing . . . role in providing community-rated health insurance."  Congressional Research Service for use by S. Comm. on the Budget, 102d Cong., 2d Sess., Tax Expenditures Compendium of Background Material on Individual Provisions, 184 (Comm. Print 1992).  The deduction allows BCBS companies to continue providing health insurance coverage without significantly impacting the availability of healthcare coverage or premiums paid by subscribers.  Unlike claims paid by Home Plans, Host Plan payments to network providers for services rendered to Home Plan subscribers are immediately reimbursed by the Home Plans.  Consequently, these payments do not impact the Host Plan's ability to maintain reserves or constitute actual pay-outs.

Moreover, as originally enacted, the special deduction codified in § 833(b) of the Tax Reform Act of 1986 was limited to "claims incurred during the taxable year."  *See* Pub. L. 99-514, § 1012, 100 Stat. 2085 (Oct. 22, 1986).  Before Congress passed the Tax Reform Act, counsel for BCBSA addressed the industry's concern that "[t]he deduction calculation is based only on claims under 'health insurance policies,'" as follows:

> The purpose of the compromise [between the United States House of Representatives and the United States Senate bills] is to permit the [BCBSA] organizations to base the deduction on the amounts reported as benefit payments on the [National Association of Insurance Commissioners (NAIC) Annual Statement B]lank, *including payments under cost plus* [sic] *contracts. The organizations are directly liable to their subscribers for those payments* and require the financial stability, which is facilitated by the deduction, to discharge those obligations. The IRS may argue that cost plus [sic] contracts are not health insurance policies, thus reducing the value of the deduction substantially.

ECF 94-6 at 262 (emphasis added).  When serving as a Host Plan, Highmark is not directly liable or otherwise obligated to its subscribers for any payments made under the expansive definition of cost-plus contracts advanced here.  Any resulting liabilities or obligations are owed to the Home Plan's subscriber(s) and borne by the Home Plan.

10

A decade later, the Taxpayer Relief Act of 1997 amended § 833(b)(1)(A)(i) to insert the clause at issue in this case: "and liabilities incurred during the taxable year under cost-plus contracts." *See* Pub. L. No. 105–34, § 1604(d)(2)(A)(i), 111 Stat. 788 (Aug. 5, 1997); *see also* H.R. Rep. No. 105–220, at 766 (1997) ("The conference agreement clarifies that, for purposes of the section 833 deduction, liabilities incurred during the taxable year under cost-plus contracts are added to claims incurred under section 833(b)(1)(A)(i)."), *reprinted at* 143 Cong. Rec. H6606 (daily ed. July 30, 1997). Of note, in amending § 833(b), Congress expressly made the change effective retroactive to the date of the Tax Reform Act of 1986. *See* Pub. L. No. 105–34, § 1604(d)(2)(A)(B), 111 Stat. 788 (Aug. 5, 1997) ("The amendment made by subparagraph (A) shall take effect as if included in the amendments made by section 1012 of the Tax Reform Act of 1986.").

Contemporaneous industry usage and understanding undermine Highmark's novel interpretation of § 833(b). *See Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1356–57 (Fed. Cir. 2005) (courts may look to industry usage and the backdrop against which a particular statute was enacted in interpreting codified unclear industry terminology). At the time Congress passed the Tax Reform Act of 1986 and the Taxpayer Relief Act of 1997, the health insurance industry understood the term "cost-plus" to refer to contracts with groups (i.e., self-funded group health plans) and not with healthcare providers or other Plans. *See, e.g.*, ECF 99-1 at 41 (NAIC's 1993 assessment of "ACS/Cost-Plus arrangements" in the context of self-funded group health plans); *id.* at 153 (2000 life and health insurance publication defining "cost-plus funding" as "[a] funding alternative for group insurance benefits under which loss payments are based on the employer's own experience plus an allowance for expenses, contingencies, and profit."). Neither statute indicates Congress' intent to significantly undercut Congress' revocation of the tax-exempt status of BCBS companies by allowing the double-counting of billions of dollars in healthcare insurance claim reimbursements by both the Home Plans and Host Plans in calculating special deductions.

BCBSA's BlueCard Program Manual similarly includes references to the term "cost-plus" associated with Home Plans (as opposed to Host Plans) and the administration of "self-funded accounts." *See, e.g.*, ECF 94-3 at 35-36. One particular reference specifies: "If any of the claims paid . . . are for cost-plus or National Accounts,[13] the Home Licensee will need to process the claims through the appropriate billing systems to recognize the corresponding revenue related to these types of businesses." *Id.* at 78. This directive would be unnecessary if, as

---

[13] National Accounts involve "[a]n employer that has offices or branches in more than one location, but offers uniform healthcare coverage of benefits to all of its employees." *See* https://www.bcbs.com/learn/glossary#N (last visited Aug. 4, 2022).

11

Highmark argues, the BlueCard Program is a cost-plus contract. Nothing in the record suggests, let alone establishes, that BCBSA itself considers the cooperation between Host Plans and Home Plans under the BlueCard Program to constitute cost-plus contracts.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for partial summary judgment (ECF 91) is **DENIED** and defendant's cross-motion for partial summary judgment (ECF 94) is **GRANTED**. The parties shall file a Joint Status Report on or before September 12, 2022, proposing a schedule of further proceedings in this matter.

It is so **ORDERED**.

Armando O. Bonilla
Judge